**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| D&B II ENTERPRISES LLC d/b/a BAIN ACCOUNTING/TAX, on behalf of itself and all other similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 13 C 5702 |
| UNIVERSAL TAX SYSTEMS, INC. d/b/a CCH SMALL FIRM SERVICES, | ) ) ) | Judge Rebecca R. Pallmeyer |
| Defendant. | ) ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff D&B II Enterprises, LLC bought computer software from Defendant Universal Tax Systems, Inc. for the purpose of preparing and filing customers' tax returns. The software suffered from numerous performance problems, and Plaintiff sued Defendant for fraud. After Judge Zagel, to whom this case was assigned, dismissed the fraud counts, Plaintiff added several contract and quasi-contract claims and moved to certify a class of persons who purchased the relevant software for the 2012 tax year. Defendant has moved for summary judgment. For the reasons explained below, Defendant's motion is granted, Plaintiff's motion to reconsider the dismissal of the fraud claims is denied, and Plaintiff's motion for class certification is stricken as moot.

<u>**BACKGROUND**</u>

The facts of this case are largely undisputed. Plaintiff D&B II Enterprises, LLC, is a Missouri limited liability company with its principal place of business in Florissant, Missouri. The company provides tax and accounting services for individual and business clients. (Def.'s Statement of Material Facts (hereafter "DSOF") [233], at ¶¶ 1, 4.) D&B's founder, Bradley Bain, was the company's owner and president from 1991 until December 2015, when "certain assets" were sold to H&R Block. (*Id.* at ¶¶ 2-3.) Bradley Bain holds undergraduate and graduate

1

degrees in Business Administration from the Southern Illinois University, and in 2012 Bain was certified by the Internal Revenue Service as a Registered Tax Return Preparer. (*Id.* at ¶ 5.) At the time of the events relevant to this lawsuit, D&B employed two accountants (of whom Mr. Bain was one), an office manager, and a receptionist. (*Id.* at ¶ 4.)

Defendant Universal Tax Systems, Inc. is a Virginia corporation "with offices in Kennesaw, Georgia" (the court presumes this is Universal's principal place of business). (*Id.* at ¶ 7.) From its Georgia offices, the company does business under the trade name "CCH Small Firm Services" and develops "ATX" brand tax software, which it sells to tax preparers for use in the preparation of tax returns for clients. (*Id.*)

Plaintiff is a long-term customer of Defendant; Plaintiff purchased ATX-brand software every year from 1991 through 2012. (*Id.* at ¶ 11.) Prior to 2012, ATX software worked well on D&B's computer network and assisted D&B in preparing tax returns for clients. (*Id.* at ¶ 15.) At his deposition, Bradley Bain testified that he could not recall using any other brand of tax software at any point in D&B's history, but that he did recall "enter[ing] into a lot of licensing agreements" for software. (*Id.* at ¶ 12; Bain Dep. 71.) Bain was asked whether, prior to the 2012 tax season, he "would just sort of automatically re-up to buy the ATX software every year," and Bain answered "yes." (Dep. of Bradley Bain (hereafter "Bain Dep.") 26, Ex. 1 to DSOF.) Prior to purchasing ATX 2012 software, D&B received "promotional materials" for "competing software products." (DSOF ¶ 16.) Bain testified that he "didn't do any big analysis" of whether to purchase ATX software in 2012, rather than the software of a competitor. (Bain Dep. 30.)

## I.     D&B's Purchase of ATX 2012

On August 16, 2012, Universal sales representative Parul Patel invited Bain via e-mail to take advantage of an "early renewal discount" on the purchase ATX software for the 2012 tax season. (Patel E-Mail of Aug. 16, 2012, Ex. 7 to DSOF.) Bain called Patel the same day and confirmed that D&B wished to purchase the 2012 ATX software. (Bain Dep. 36-37.) Someone associated with Universal (the parties do not specify whom) then e-mailed Bain a document

titled Deferred Payment Agreement.  (DSOF ¶ 20).  Bain testified that he signed the agreement even though he "didn't read all the terms and conditions.  I purchased [the ATX 2012 software] because of my prior experience with ATX."  (Bain Dep. 41.)

The Deferred Payment Agreement provided, *inter alia*, that D&B agreed to purchase the ATX 2012 software for $1318, with $69 due immediately on August 16 and the remaining balance of $1249 due on December 5, 2012.  (DSOF ¶ 22; Deferred Payment Agreement (hereafter "DPA") 2012 Invoice and Payment Plan, Ex. 8 to DSOF.)  The Deferred Payment Agreement also stated that it "in no way modifies or amends the CCH SFS Software License Agreement or the CCH SFS Refund Policy (see www.cchsfs.com/legal) to which Customer acknowledges it is subject to by purchasing and using the software."   (*Id.* at § 3(c).)

Neither Bain nor any other representative of D&B clicked on the link noted above, or searched Universal's website for a "CCH SFS Software License Agreement" or a "CCH SFS Refund Policy," before D&B entered into the Deferred Payment Agreement  (Pl.'s Resp. to DSOF [246], at ¶ 29.)  If Bain had followed the link, he would have been presented with a website that contained several additional links, titled "Standard Software License Agreement," "Client Accounting Suite License Agreement," "Intelliforms Software License Agreement," and "PaperlessPLUS (Scan&Fill) Software License Agreement."  (Pl.'s Statement of  Add'l Material Facts (hereafter "PSAMF") [247], at ¶ 36; Ex. 44 to PSAMF; Def.'s Resp. to PSAMF [257], at ¶ 36.) The website also contained a link titled "Software Refund Policy (current)."   (Ex. 44 to PSAMF.)

A user who clicked the link titled "CCH SFS Refund Policy" on August 16, 2012, would have been presented with a document titled "CCH Small Firm Services Software Refund Policy."  (Decl. of Dennis Brown (hereafter "Brown Decl."), at ¶ 5, Ex. 19 to Def.'s Resp. to PSAMF; CCH Refund Policy, Ex. 9 to DSOF.)  This document states, *inter alia*, that CCH "will provide a full refund for tax preparation software for tax year 2012 purchased directly from CCH SFS," so long as the software was not used to file more than one tax return and the refund was

requested by February 28, 2013. (CCH Refund Policy § I(A).) "If the software was used for filing of returns," the Refund Policy continues, "a service charge of $20.00 per filed return, starting with the 2nd return filed, will be deducted from the refund amount." (*Id.*)

A user who clicked the link "Standard Software License Agreement" on August 16, 2012, would have been presented with a document titled "CCH Small Firm Services Standard Software License Agreement." (Brown Decl. ¶ 6.) Section 8.3 of this document, titled "Limited Warranty," reads as follows:

> EXCEPT AS STATED IN <u>SUBSECTION 8.1</u>,[1] THE SOFTWARE, THE DELIVERABLES AND ANY THIRD PARTY SOFTWARE ARE PROVIDED "AS IS" WITHOUT WARRANTY OF ANY KIND, EITHER EXPRESS OR IMPLIED. CCH SFS DISCLAIMS AND EXCLUDES ANY AND ALL OTHER WARRANTIES INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES OF TITLE, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, IRRESPECTIVE OF ANY COURSE OF DEALING OR PERFORMANCE, CUSTOM OR USAGE OF TRADE. CUSTOMER BEARS THE ENTIRE RISK AS TO THE QUALITY AND PERFORMANCE OF THE SOFTWARE AND THE DELIVERABLES. CCH SFS DOES NOT WARRANT THAT THE SOFTWARE OR DELIVERABLES WILL BE UNINTERRUPTED, THAT THEIR USE OR OPERATION WILL BE ERROR OR DEFECT FREE, THAT ALL APPLICATION DEFECTS WILL BE CORRECTED, OR THAT THE SOFTWARE WILL PROPERLY OPERATE ON ANY SPECIFIC OPERATING SYSTEM OR COMPUTER HARDWARE OR CONFIGURATIONS OR BEFORE/AFTER ANY SPECIFIC DATE OR TIME PERIOD . . . . NO EMPLOYEE OR AGENT OF CCH SFS OR ANY OF ITS SUBSIDIARIES OR AFFILIATES IS AUTHORIZED TO MAKE ANY STATEMENT THAT ADDS TO OR AMENDS ANY OF THE WARRANTIES OR LIMITATIONS CONTAINED IN THIS AGREEMENT.

(Standard Software License Agreement (hereafter "2011 SSLA") § 8.3, Ex. C to Decl. of Dennis Brown, Ex. 19 to Def.'s Resp. to PSAMF.) Section 8.4, in turn, disclaims liability "FOR ANY LOSS OF PROFITS, SALES, BUSINESS, DATA OR OTHER INCIDENTAL, CONSEQUENTIAL, OR SPECIAL LOSS OR DAMAGE," and states that CCH SFS's "total

---

[1] Section 8.1 is titled "CCH SFS' General Warranties," and reads as follows: "CCH SFS represents and warrants that: (i) it has title to the Software and the right to grant Customer the rights granted hereunder; (ii) the Software and Deliverables do not violate any third party's United States intellectual property rights; and (iii) CCH SFS has not knowingly inserted any virus, worm, trap door, back door, timer, clock, counter, or other limiting routine, instruction or design that would erase data or programming or otherwise cause any system to become inoperable or incapable of being used in the full manner for which it was designed and created." (Standard Software License Agreement § 8.3, Ex. C to Decl. of Dennis Brown, Ex. 19 to Def.'s Resp. to PSAMF.)

liability" in any dispute arising out of the agreement "WILL NOT EXCEED THE TOTAL FEES PAID OR PAYABLE FOR THE SOFTWARE HEREUNDER BY CUSTOMER." (*Id.* at § 8.4.)

Section 11.1 states that "[t]his agreement, along with the Order Confirmation and any other terms referenced by this Agreement but otherwise published by CCH SFS outside of this Agreement, constitutes the entire and exclusive agreement . . . between Customer and CCH SFS with respect to the Software and Deliverables to be furnished hereunder." (*Id.* at § 11.1.) It also states that "[o]ral statements made about the Software and/or Deliverables do not constitute warranties, will not be relied on by Customer, and will not be binding or enforceable," and that "[n]o supplement or amendment of this Agreement will be binding unless executed in writing by CCH SFS and Customer after reasonable opportunity to accept or reject such supplement, modification or amendment." (*Id.*)

On September 4, 2012, Defendant's Digital Marketing Manager published an updated version of the Standard Software License Agreement at the URL that previously hosted the document quoted above. (Brown Decl. ¶¶ 7-8.) The portions of the two documents that are relevant to this case are materially identical, except that the language located in sections 8.1, 8.3, 8.4, and 11.1 of the 2011 version appeared at sections 7.1, 7.3, and 7.4, and 10.1 of the 2012 version. (*Id.*; 2011 SSLA §§ 8.1, 8.3, 8.4, 11.1; 2012 SSLA §§ 7.1, 7.3, 7.4, 10.1, Ex. 11 to DSOF.)

D&B received the ATX 2012 software in the mail in either November or December of 2012. (DSOF ¶ 36; Pl.'s Resp. to DSOF ¶ 36.) In December 2012, Bain directed the company's third-party technology consultant to install the software on D&B's server at its office in Florissant, Missouri. (*Id.*) During the installation process, a pop-up box appeared on the computer screen used by the consultant. (*Id.* at ¶ 37.) The pop-up box presented the consultant with the opening paragraph of the 2012 SSLA, which stated that "[b]y installing and/or using the Software or by otherwise indicating acceptance (electronically or otherwise) of this Agreement, Customer acknowledges agreement to the terms set forth below." (*Id.* at ¶ 38.)

5

The pop-up box directed, but did not require, the consultant to "Press the PAGE DOWN key to see the rest of the agreement." (*Id.*)  A scroll bar, which allowed users to scroll down and view the entire 2012 SSLA, also appeared to the right of the text on the pop-up screen. (*Id.*)  At the bottom of the pop-up screen, the following text appeared: "Do you accept the terms of the preceding License Agreement? If you select No, the setup will close.  To install ATX 2012, you must accept this agreement." (*Id.*)

Bain admitted at his deposition that the technology consultant "consulted with" Bain before clicking the "Yes" button, thereby accepting the agreement and beginning the installation. (Bain Dep. 57-58.)  Bain did not scroll down to read the full text of the agreement before he directed the consultant to click "Yes." (*Id.*)  "I trusted CCH," Bain testified.  "I mean, I didn't need to read the information.  I had used them for years and I trusted CCH." (*Id.* at 59.)

## II.     Problems with ATX 2012 Emerge

D&B first tried to use the ATX 2012 software on or shortly after the day it was installed on D&B's server.  (Bain Dep. 159, Ex. 42 to PSAMF.)  The ATX 2012 software "crashed" immediately.  (*Id.* at 69.)  It "crashed" the following day as well, and on numerous occasions thereafter.  (*Id.* at 160.)  Even when the software did not crash, it did not perform according to D&B's expectations.  It processed data slowly, failed to "roll over" customers' returns from previous years, and was unable to "complete complex business returns."  (PSAMF ¶ 47; Def.'s Resp. to PSAMF ¶ 47; First Am. Compl. [32], at ¶ 38(a).)  Sometimes, the software presented "calculations" on printed forms that were different from those "actually included in returns electronically filed with the IRS." (*Id.*)  Bain and/or D&B's technology consultant communicated with Defendant's technical service representatives 20 to 25 times between January 2013 and April 2013.  (Bain Dep. 75-76, 125-26.)  Defendant's representatives initially told Bain that the issues he reported were caused by D&B's computer systems, rather than the ATX 2012

software.  (*Id.* at 77.)[2]  At some point, however—Bain does not specify when—unidentified individuals from Defendant's "support line" began saying "[t]here's a new release coming out.  There's a new release coming out.  We're going to fix that problem.  We're going to fix that problem."  (*Id.* at 90-91.)

D&B was not alone in experiencing problems with ATX 2012.  On January 15, 2013, Defendant's Vice President of Customer Experience, Rusty Tillman, wrote an e-mail titled "SFS Weekly Update" that reported, among other things, "serious concerns on the floor regarding ATX performance."  (Ex. 22 to PSAMF.)  According to Tillman, "[s]preadsheet functionality, splitting out payroll forms and speed/performance are the three main issues we are dealing with multiple times a day."  (*Id.*)  On February 19, 2013, Product Support Supervisor Douglas R. Brown wrote an e-mail to CCH SFS's new President, Jason Marx, outlining possible strategies to "stem the tide of calls" about ATX's "performance."  (Ex. 10 to PSAMF.)  This e-mail noted that "[a] large number of calls are from customers who are unable to rollover returns from the prior year software, or are unable to open rolled over returns.  This is the first thing most customers do and is a key feature that is widely failing in the field."  (*Id.*)  The e-mail also noted that "[a] number of the issues we have encountered were identified by Tech Support reps as weaknesses well before the release of the software."  (*Id.*)

Between January and April 2013, Defendant released 15 separate updates intended to resolve problems such as "returns incorrectly generating the 'Cannot Open Rolled Over Return' message" and "an issue where the program closed when attempting to open a return." (Release Notes, Versions 12.4, 12.9, Ex. 35.)  Bain testified that the updates never resolved some or all of the problems D&B experienced with ATX 2012.  (Bain Dep. 116.)  Describing

---

[2]    Bain testified that one of Defendant's representatives eventually conceded to D&B's technology consultant that "it wasn't [D&B's] problem."  (Bain Dep. 124.)  The statement from D&B's own technology consultant to Bain regarding what Defendant's representative told him is hearsay.

update 12.10, which Defendant released in February 2013, Bain stated "[i]t was just maybe a Band-Aid on a surgical wound." (*Id.* at 189-90.)

Defendant made several public statements regarding its efforts to resolve the problems with ATX 2012. On January 21, Tillman sent an e-mail addressed to "valued ATX customers," stating, among other things, that "[y]ou can be confident that our most recent update and those to come will improve ATX performance." (Ex. 26 to PSAMF.) On February 4, 2013, the company posted a video interview with then-President Jeff Gramlich on "the ATX TV website." (PSAMF ¶ 17.) In this video, Gramlich stated that "we have numerous forms coming out with this late start season, we have software updates. I would encourage our customers to stay current with the updates." (*Id.*) On March 7, 2013, the Defendant's new President, Jason Marx, e-mailed the company's customers, acknowledging that "there have been challenges this year" and apologizing for "the frustration this has caused." (Ex. 28 to PSAMF.) "From now, through tax season and beyond," Marx wrote, "we will be singularly focused on making sure that we are doing everything we can to provide you with a software solution that delivers on our promise to you." (*Id.*)

In spite of D&B's problems with ATX 2012, the company succeeded in filing approximately 1,300 tax returns using the software. (Pl.'s Resp. to DSOF ¶ 53.) Bain testified that ATX 2012 caused "errors" on some of the forms D&B filed with the IRS, but Plaintiff hasn't provided any further information about what those errors were or how many errors occurred. (Bain Dep. of Sept. 2016 (hereafter "Bain Dep. II"), at 160-61, Ex. 2 to DSOF; Pl.'s Resp. to DSOF ¶ 54.) Bain also testified that he reimbursed $500 to a customer at some point (he did not specify when), and that he believes this reimbursement was related to a penalty assessed by the IRS. (Bain Dep. II 164-66.) Plaintiff offers no further details about this incident or any documentation substantiating it. (Pl.'s Resp. to DSOF ¶ 55.)

D&B filed a Class Action Complaint in the Circuit Court of Cook County, Illinois, on May 29, 2013, alleging violations of the Illinois Consumer Fraud and Deceptive Business

Practices Act (ICFA). (*See* Compl. [1-1].) Defendant removed the case to federal court on August 9, 2013, and Judge James Zagel presided over the proceedings until he took senior status in October 2016. (*See* Executive Committee Order [153].) Defendant filed a motion to dismiss [28] on December 12, 2013. In lieu of responding to Defendant's motion, Plaintiff filed a First Amended Class Action Complaint [32] on January 15, 2014, alleging fraudulent omission, fraudulent concealment, and breach of the implied warranty of merchantability, as well its original ICFA claim. Defendant subsequently filed a motion for summary judgment [85], which Judge Zagel granted as to all Plaintiff's claims except breach of the implied warranty of merchantability. (*See* Mem. Opinion and Order, June 26, 2015 [108].) "Even a finding that the [SSLA], rather than the Payment Agreement, was the operative contract that governs the purchase of the ATX 2012 cannot protect Universal from liability for failure to fulfill the new promise it made to D&B that Universal would fix the ATX 2012 software," Judge Zagel wrote. (*Id.* at 4-5.) "Universal cannot now disclaim warranties and limit damages to the purchase price when, rather than refunding D&B at the outset of its difficulties, it went outside the scope of the original agreement for the purchase of ATX 2012 to salvage its business relationships by attempting to fix its defective software." (*Id.* at 5.)

Following this lead, Plaintiff filed a Second Amended Class Action Complaint [113] the following month, adding claims for breach of an implied-in-fact contract to repair the ATX 2012 software, unjust enrichment, and promissory estoppel. On May 5, 2017, Plaintiff asked this court to reconsider Judge Zagel's summary judgment order with regard to Plaintiff's ICFA claim. The same day, Plaintiff moved to certify a class consisting of "[a]ll persons that purchased CCH SFS's ATX 2012 professional tax software for use in preparing individual and business tax returns for the 2012 tax year." (Pl.'s Mem. in Supp. of Mot. for Class Cert. [216], at 2.) On May 10, 2017, this court stayed class-certification proceedings [230] pending resolution of Defendant's Motion for Summary Judgment [231]. That motion and Plaintiff's Motion for Reconsideration [209] are now before the court.

## <u>DISCUSSION</u>

To prevail on a motion for summary judgment, the moving party must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Burton v. Downey*, 805 F.3d 776, 783 (7th Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The moving party's burden "may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

I. **Implied warranty of merchantability**

The Illinois Uniform Commercial Code allows merchants to disclaim the implied warranty of merchantability, provided they do so using "conspicuous" language that "mention[s] merchantability. 810 ILCS 5/2-316(2). The parties may disclaim *all* implied warranties "by expressions like 'as is,' 'with all faults' or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty." *Id.* at § 5/2-316(3)(a).

Defendant contends it made such a disclaimer in this case, and Plaintiff does not argue that the disclaimer of warranties in the 2012 SSLA is insufficient as written. Rather, Plaintiff argues that the 2012 SSLA is unenforceable for one or more of the following reasons: (1) Plaintiff never agreed to the 2012 SSLA, and the Deferred Payment Agreement (to which Plaintiff did agree) did not incorporate the 2012 SSLA by reference; (2) enforcement of the 2012 SSLA would be procedurally unconscionable; and (3) enforcement of the 2012 SSLA would be substantively unconscionable. The court considers these arguments in turn.

a.      **Incorporation by reference**

"For a contract to incorporate all or part of another document by reference, the reference must show an intention to incorporate the document and make it part of the contract."  *188 LLC v. Trinity Industries, Inc.*, 300 F.3d 730, 736 (7th Cir. 2002) (quoting *Wilson v. Wilson*, 217 Ill. App. 3d 844, 577 N.E.2d 1323, 1329 (1st Dist. 1991)).   Under Illinois law, evidence of this intention to incorporate must be "clear and specific."  *Id.* (citing *Kirschenbaum v. Northwestern Univ.*, 312 Ill. App. 3d 1017, 728 N.E.2d 752, 762 (1st Dist. 2000)).

Plaintiff first claims that the Deferred Payment Agreement (DPA) does not incorporate the 2012 SSLA by reference because the language in the DPA is insufficiently "clear and specific."  Plaintiff does not dispute that section 3(c) of the DPA states that the agreement "in no way modifies or amends the CCH SFS Software License Agreement or the CCH SFS Refund Policy (see www.cchsfs.com/legal) to which Customer acknowledges it is subject to by purchasing and using the software."  But Plaintiff claims that "[t]he phrase 'subject to' is insufficient."  (Pl.'s Resp. Br. [246], at 8 n.5.)

Neither of the cases Plaintiff cites for this contention supports it.  In *188 LLC*, the Seventh Circuit considered whether a contract for the lease of railroad tanker cars incorporated a limitation of remedies provision located in a separate document titled "Trinity Railcar Repair General Terms and Conditions Form 4."  300 F.3d at 733.  The only purported reference to Form 4 in the parties' contract was the following statement: "Sales of all services and materials are subject to the general terms and conditions on the reverse side [of the contract]."  *Id.*  The parties disputed whether anything at all was printed on the reverse side of the contract, but Defendant argued that because the contract expressly included certain terms and conditions that *also* appeared on Form 4, the parties had agreed to incorporate the entirety of Form 4 into the contract regardless of whether it was printed on the back of the contract.  *Id.*  The district court held that the language "[s]ales of all services and materials are subject to the general

terms and conditions on the reverse side" was sufficient to incorporate Form 4 into the contract, even if Form 4 did not actually appear on the reverse side of the contract. *Id.* at 736. The Seventh Circuit reversed, explaining only that the contract "does not specifically refer to Form 4 or any specific set of terms and conditions." *Id.* at 737.

Plaintiff appears to believe that because the Seventh Circuit found that a sentence that contained the phrase "subject to" did not incorporate another document by reference, any sentence containing the phrase "subject to" is, as a matter of law, insufficient evidence of the parties' intent to incorporate another document by reference. That is not what *188 LLC* held. Although the court did not explain its reasoning in detail, its conclusion that the sentence was insufficient was clearly based on the complete absence of any reference to the supposedly incorporated document (that is, Form 4), and *not* the supposed ambiguity of the phrase "subject to." The court's one-sentence explanation of its reasoning states that "[t]he incorporation clause on the face of the [contract] *does not specifically refer to Form 4* or any specific set of terms and conditions." *Id.* at 737 (emphasis added). The court did not discuss the sufficiency of the phrase "subject to" at all. *Id.*

Plaintiff's other case offers no more support for the supposed insufficiency of the phrase "subject to." In that case, the parties disputed whether an arbitration clause in one contract between the parties extended to disputes arising from another contract between the same parties. *Bd. of Managers of Chestnut Hills Condominium Ass'n v. Pasquinelli, Inc.*, 354 Ill. App. 3d 749, 822 N.E.2d 12 (1st Dist. 2004). Defendant argued that the contract without the arbitration clause incorporated by reference the contract that contained one, because the contract without an arbitration clause included the following language: "[p]urchaser has read and understood the terms of the sample copy of the [contract containing an arbitration clause], including any provision that may require all disputes that arise under the [contract with an arbitration clause] to be submitted to arbitration." *Id.* at 735 (emphasis removed). The court

concluded that a mere reference "to the existence" of the other contract did not show an intent to incorporate that other contract by reference. *Id.*

Here, unlike the referring contract in *Pasquinelli*, the Deferred Payment Agreement does more than simply mention the existence of the "CCH SFS Software License Agreement." It states that the parties are "subject to" that agreement. Since neither of the parties contends that Plaintiff had already entered into the SSLA at the time Plaintiff executed the Deferred Payment Agreement, the only way Plaintiff could be "subject to" the SSLA is if the DPA incorporates the SSLA by reference.

Plaintiff next argues that the DPA's description of the SSLA as an "other" agreement, in the title of DPA Section 3(c), along with references to "this" agreement in other sections of the DPA, "makes clear" that the DPA does not incorporate any "other" agreements by reference. (Pl.'s Resp. Br. 8-9.) This argument is not persuasive. Language distinguishing one document from another does not automatically preclude incorporation by reference. If anything, such language *may be a prerequisite* for incorporation by reference, as the concept of incorporation by reference implies the existence of an incorporating document that is distinguishable from the document being incorporated. In the absence of an "other" document, there would be nothing for "this" document to incorporate.

As Defendant notes in its Reply Brief, the parties' dispute about whether the DPA incorporated the SSLA by reference is arguably superfluous, because even if the court were to conclude that the DPA does not incorporate the SSLA by reference, Plaintiff agreed to be bound by the SSLA when it clicked "Yes" on the pop-up box containing the SSLA and began installation of the ATX 2012 software. (Def.'s Reply Br. 3.) Plaintiff responds that there cannot have been any manifestation of mutual intent to be bound by additional terms that were not included in the DPA, either because the DPA "is not conditioned on later acceptance of a license agreement," or else because "neither the Payment Agreement nor the [SSLA] indicates that an ATX 2012 purchaser could avoid the unacceptable license terms by returning ATX 2012

for a full refund." (Pl.'s Resp. Br. 10.) It is true, as Plaintiff notes, that "shrinkwrap" contracts—that is, contracts for the sale of tangible goods that do not inform the purchaser of the specific terms governing his use of the goods until after the purchase is complete—are, as a general rule, enforceable only if the purchaser was provided notice of the existence of additional terms before the purchase, and if the purchaser subsequently had an opportunity to reject additional terms he found unacceptable by returning the purchased goods for a full refund. *See, e.g.*, *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447 (7th Cir. 1996) ("Notice on the outside, terms on the inside, and a right to return the software for a refund if the terms are unacceptable . . . may be a means of doing business valuable to buyers and sellers alike."). But Plaintiff *did*, in fact, receive the requisite notice and opportunity to return the ATX 2012 software. The Deferred Purchase Agreement referred to an additional agreement to which Plaintiff's purchase and use of the software was "subject," and Defendant's Refund Policy expressly provided Plaintiff with a contractual right to return the software for a full refund, so long as Plaintiff requested such a refund before February 28, 2013, and did not use the software to file more than one tax return.

In sum, this court rejects Plaintiff's arguments that it cannot be bound by SSLA's disclaimer of the implied warranty of merchantability because it never agreed to be bound by the SSLA in the first place. The DPA incorporated the SSLA by reference, but even if it didn't, Plaintiff subsequently agreed to be bound by the additional terms in the SSLA when Plaintiff directed its agent to click "Yes" on the pop-up box, thereby beginning installation of the ATX 2012 software.[3]

---

[3] Plaintiff also argues that the SSLA cannot have been a valid modification of the DPA because Defendant did not provide any consideration for the modification. (*See* Pl.'s Resp. Br. 17-18.) But Plaintiff itself concedes that the validity of this argument depends on the agreements in question being governed by the common law of contracts, rather than the relevant sections of the Illinois Uniform Commercial Code. Under Illinois law, the UCC applies to the sale of software so long the services provided along with the sale are "not substantially different from those generally accompanying package sales of computer systems consisting of hardware and software." *Dealer Mgmt. Systems, Inc. v. Design Automotive Group, Inc.*, 355 Ill. App. 3d 416, 421, 822 N.E.2d 556, 561 (2d Dist. 2005). "Such ancillary services include installation, training, and technical support." *Id.* Here, there is no evidence that Plaintiff

### b.    Procedural Unconscionability

Even if Plaintiff did agree to be bound by the disclaimer of implied warranties, it would not be enforceable if "some impropriety during the process of forming the contract depriv[ed] Plaintiff] of a meaningful choice." *Kinkel v. Cingular Wireless LLC*, 223 Ill. 2d 1, 23, 857 N.E.2d 250, 264 (2006).   "Procedural unconscionability refers to a situation where a term is so difficult to find, read, or understand that the plaintiff cannot fairly be said to have been aware he was agreeing to it." *Id.* (citation omitted).   "Factors to be considered in determining whether an agreement is procedurally unconscionable include whether each party had the opportunity to understand the terms of the contract, whether important terms were 'hidden in a maze of fine print,' and all of the circumstances surrounding the formation of the contract." *Phoenix Ins. Co. v. Rosen*, 242 Ill. 2d 48, 60, 949 N.E.2d 639, 647 (2011).

Plaintiff's argument about procedural unconscionability centers on Defendant's substitution of the 2012 SSLA on Defendant's website for the 2011 SSLA on September 4, 2012.   Because Plaintiff only had access to the 2011 SSLA when Plaintiff entered into the Deferred Purchase Agreement on August 16, 2012, Plaintiff argues, it "cannot fairly be said to have been aware [it] was agreeing to" the terms of the 2012 SSLA, *Kinkel*, 223 Ill. 2d at 23, 857 N.E.2d at 264.

Plaintiff analogizes his case to *Trujillo v. Apple Computer, Inc.*, 578 F. Supp. 2d 979 (N.D. Ill. 2008) (Kennelly, J.), but *Trujillo* is distinguishable from this case.   In *Trujillo*, another court in this district concluded that the purchaser of an Apple iPhone could not be bound by an arbitration clause located in terms of service to which the plaintiff-customer purportedly accepted, because those terms of service were not realistically available to the plaintiff at the time of his acceptance.   As in this case, the defendant argued that the agreement was not

---

received services along with its contract to purchase and license ATX 2012 beyond the single "ancillary" service of technical support.   The court concludes that the UCC governs Plaintiff's purchase and license, and therefore rejects Plaintiff's argument with regard to the absence of consideration to support modification.

procedurally unconscionable because the terms were posted on defendant's website at the time of the plaintiff's acceptance. Also as in this case, the defendant subsequently conceded that the version of these terms that was posted on its website at the time of the plaintiff's agreement was "out-of-date." *Id.* at 989. It is unclear, however, whether the relevant terms of the contracts in *Trujillo* were materially identical, as they are here. And there was "no evidence—none— regarding how Trujillo would have known, before or when he purchased the iPhone, that the service terms were available on the Internet, let alone how to find them." *Id.* In this case, the Deferred Service Agreement expressly notified Plaintiff that an agreement to which it was agreeing to be "subjected" was available for review at a specific URL. At the least, this provided Plaintiff with advance notice that it would be required to agree to additional terms, not spelled out in the DPA, in order to use the ATX 2012 software. It also put Plaintiff on notice that it would be eligible for a full refund of the purchase price if Plaintiff returned the software, without using it to file more than one tax return, before February 28, 2013. Trujillo, by contrast, had already purchased the iPhone when he first "saw or had access to" the additional terms. *Id.* at 993. Trujillo also would not have been eligible for a full refund had he known about, and rejected, the additional terms. *Id.*

In sum, the fact that it was the 2011 version of the SSLA, rather than the 2012 version, that was available to Plaintiff at the time it agreed to purchase ATX 2012 software was not obviously prejudicial to Plaintiff's ability to "find, read, or understand" the terms of the contract to which he agreed, or to reject those terms without material penalty if they were unacceptable. *See Bess v. DirecTV, Inc.*, 381 Ill. App. 3d 229, 238-39, 885 N.E.2d 488, 496-97 (5th Dist. 2008) (rejecting claim that additional license terms not in plaintiff's possession at time of purchase were procedurally unconscionable, because plaintiff could have avoided "deactivation fee" by cancelling service upon receipt of the additional terms.)

### c. Substantive Unconscionability

"Substantive unconscionability concerns the actual terms of the contract and examines 'the relative fairness of the obligations assumed,' asking whether the terms are 'so one-sided as to oppress or unfairly surprise an innocent part.'" *Phoenix Ins. Co.*, 242 Ill. 2d at 60, 949 N.E.2d at 647. Although "[s]ubstantive unconscionability concerns the actual terms of the contract," *Kinkel*, 223 Ill. 2d at 28, 857 N.E.2d at 267 (citation omitted), rather than the fairness of the process by which the contract was formed, "considerations like [a party's] being a sophisticated actor which accepted the same terms repeatedly over several years remain relevant." *ChampionsWorld, LLC v. U.S. Soccer Federation, Inc.*, 890 F. Supp. 2d 912, 945 (N.D. Ill. 2012) (Leinenweber, J.) *See also We Care Hair Development, Inc. v. Engen*, 180 F.3d 838, 843 (7th Cir. 1999) (noting that the parties asserting substantive unconscionability "were 'not vulnerable consumers or helpless workers,' but rather 'business people who bought a franchise'") (quoting *Original Great American Chocolate Chip Cookie Co., Inc. v. River Valley Cookies, Inc.*, 970 F.2d 273, 281 (7th Cir. 1992)).

Plaintiff first suggests that Defendant subjected it to "unfair surprise" by providing an inferior product when Plaintiff "believed the software would function as before." (Pl.'s Resp. Br. 15.) But this is not the type of surprise that is relevant to unconscionability. It is surprise as to the *terms of a contract*, not the quality of the product that plaintiff agreed to buy, that can be a warning sign of unconscionability. *See, e.g.*, *Timmerman v. Grain Exchange, LLC*, 394 Ill. App. 3d 189, 197, 915 N.E.2d 113, 121 (5th Dist. 2009) (affirming trial court's finding of unfair surprise where contract's arbitration provision "was so difficult to find and read that the plaintiffs cannot fairly be said to have been aware that they were agreeing to it").

Plaintiff next argues that the SSLA's disclaimer of liability for lost profits, incidental damages, and consequential damages deprived Plaintiff of "minimum adequate remedies." (Pl.'s Resp. Br. 16.) But the contract permits Plaintiff to recover "the total fees paid or payable"

by Plaintiff for the ATX 2012 software (2012 SSLA § 7.4), and Illinois courts have rejected unconscionability challenges to similar limitations on damages in the past. *See Halloran & Yauch, Inc. v. Roughneck Concrete Drilling & Sawing Co.*, 2013 IL App. (1st) 131059-U ¶¶ 52-53 (1st Dist. 2013) (citing cases). Plaintiff cites no reason for this court to believe that such a limitation is more problematic here, or in the context of software licensing agreements generally, than in *Halloran & Yauch* or the cases cited therein. Nor has Plaintiff presented evidence to support its contention that the limitation on liability and/or the disclaimer on implied warranties undermined the core purpose of the bargain between the parties, by permitting Defendant to deliver, free from any consequences, the equivalent of "an automobile without an engine," *Blankenship v. Northtown Ford, Inc.*, 95 Ill. App. 3d 303, 307, 420 N.E.2d 167, 171 (4th Dist. 1981).

Plaintiff does suggest that Defendant's purported failure to "disclose known defects" about the ATX 2012 software "is relevant." (Pl.'s Resp. Br. 16.) Plaintiff analogizes this case to *Skeen v. BMW of North America, LLC*, where a New Jersey court concluded that a group of plaintiffs "adequately alleged substantive unconscionability by claiming that Defendants knew" about certain latent defects in their products "and manipulated the warranty terms to avoid paying for it." No. 2:13-cv-1531-WHW-CLW, 2014 WL 283628, at *14 (D.N.J. Jan. 24, 2014). But D&B has not alleged that Defendant "manipulated the warranty terms to avoid paying for" the problems D&B and other customers experienced when using ATX 2012, much less presented actual evidence of knowing manipulation. It appears that Defendant began including the warranty disclaimers in its licensing agreements months, if not years, before Defendant first became aware of ATX 2012's flaws. (*See* 2011 SSLA §§ 8.3, 8.4.)

The agreement in this case was entered into by two experienced business entities. Although it limited Defendant's potential liability for breaches of the agreement, it did not insulate Defendant from all liability under the contract or permit Defendant to entirely avoid performance of its core contractual obligation. Defendant did not obtain Plaintiff's consent to the

agreement's terms through unfair surprise, and Plaintiff has presented no evidence that Defendant "manipulated" the warranty terms based on insider knowledge of flaws in its products. This court therefore rejects Plaintiff's argument that the 2012 SSLA is substantively unconscionable.

## II.     Implied-in-fact contract to repair

Even if the SSLA precludes Defendant's liability for breach of the implied warranty of merchantability, Plaintiff contends that the parties entered into a new, implied-in-fact contract to repair the defects in the ATX 2012 software. (Pl.'s Resp. Br. 21-23.) "Contracts implied in fact arise from a promissory expression that is inferred from circumstantial evidence of an intent to be bound." *Zadrozny v. City Colleges of Chicago*, 220 Ill. App. 3d 290, 295, 581 N.E.2d 44, 47 (1st Dist. 1991). The elements of both implied and express contracts are the same under Illinois law: "offer, acceptance, and consideration." *Nissan N. Am., Inc. v. Jim M'Lady Oldsmobile, Inc.*, 486 F.3d 989, 996 (7th Cir. 2007).[4] "The parties' minds must meet through offer and acceptance, and the contract must be definite in its terms." *Lirtzman v. Fuqua Industries, Inc.*, 677 F.2d 548, 551 (7th Cir. 1982).

Plaintiff claims that Defendant's "numerous post-sale and delivery assurances that it could and would fix the defects in the ATX 2012 software" constitute "promissory expressions" that demonstrate Defendant's intent enter into a new contract to repair. (Pl.'s Resp. Br. 22.) Defendant, however, points to language in section 10.1 of the 2012 SSLA (and section 11.1 of the 2011 SSLA), which Defendant says prohibits any claim that Defendant's (or its agents') "assurances" constitute evidence of Defendant's intent to enter into a new contract. These sections read as follows: "Oral statements made about the Software and/or Deliverables do not constitute warranties, will not be relied on by Customer, and will not be binding or enforceable." They go on to state that "[n]o supplement or amendment of this Agreement will be binding

---

⁴        So too for Georgia and Missouri law. *See Lockett v. Allstate Ins. Co.*, 364 F. Supp. 2d 1368, 1380 (M.D. Ga. 2005); *Follman Prop. Co. v. Henty Const. Co., Inc.*, 664 S.W.2d 248, 250 (Mo. Ct. App. 1983).

unless executed in writing by CCH SFS and Customer after reasonable opportunity to accept or reject such supplement, modification or amendment."

The language in these provisions appears to prohibit exactly the kind of implied-in-fact contract Plaintiff claims was formed as a result of Defendant's representations. Bradley Bain testified that unidentified individuals from Defendant's "support line" told him "[t]here's a new release coming out. There's a new release coming out. We're going to fix that problem. We're going to fix that problem." (Bain Dep. at 90-91.) These are "oral statements made about the Software," and the SSLA to which D&B agreed expressly provided that they "do not constitute warranties, will not be relied on by Customer, and will not be binding or enforceable." So too with then-President Gramlich's assertions, in an online video interview on February 4, 2013, that "we have software updates," and "I would encourage our customers to stay current with the updates." (PSAMF ¶ 17.) These oral representations about ATX 2012 cannot be binding or enforceable because of the SSLA.

Vice President Tillman's January 21 e-mail to ATX customers—which stated "[y]ou can be confident that our most recent update and those to come will improve ATX performance" (Ex. 26 to PSAMF)—is somewhat more complicated. This was a written communication, not an oral representation. So, too, was President Marx's March 7 avowal, in another e-mail to ATX customers, that Defendant would "be singularly focused on making sure that we are doing everything we can to provide you with a software solution that delivers on our promise to you." (Ex. 28 to PSAMF.) These representations are not prohibited by the language relating to "oral statements." But they nevertheless fit within the next disclaimer in the SSLA on "supplement[s]" to the SSLA that were not "executed in writing by CCH SFS *and Customer.*" (emphasis added) Even if one or both of Tillman and Marx's e-mails are construed as written offers from Defendant, "Customer"—that is, D&B—never accepted that offer in writing. Any contractual obligation that might otherwise have been formed by the parties' conduct here was expressly disclaimed in the SSLA.

20

Plaintiff argues that, as a matter of law, "[a] disclaimer of extra-contractual representations applies only to previous or contemporaneous representations, not subsequent representations." (Pl.'s Resp. Br. 20.) It cites the Seventh Circuit's decision in *Williams v. Jader Fuel Co.* to support this assertion, but Plaintiff has overstated the holding in that case. Jader Fuel Company entered into an agreement in late 1981 with Lovilia Coal Company and its owner, Billie Williams, granting Lovilia the exclusive right to exercise Jader's rights to mine two seams of coal. 944 F.2d 1388, 1391 (7th Cir. 1991). Lovilia agreed to mine these seams continuously until they were depleted; Jader agreed to market the coal Lovilia extracted and pay Lovilia 70% of the sale price. *Id.* The agreement also contained terms relating to a second, adjacent tract of land, where Jader had not yet acquired mining rights but expected to in the future. *Id.* The parties agreed that Lovilia would obtain permission from Jader before it mined coal on the second parcel; though the agreement did not expressly require that Jader provide this permission in writing, it did include a provision stating that "[a]ny and all notices provided for herein shall be in writing," as well as a merger clause and a provision requiring that any modifications to be in writing. *Id.* Later, Lovilia began mining seams under the second parcel without Jader's permission, only to suffer significant damage to one of Lovilia's underground tunnels caused by Jader's activities in strip mining that parcel itself. *Id.* at 1392.

Williams sued Jader in federal district court, alleging, *inter alia*, breach of the parties' implied covenant of good faith and fair dealing. Jader argued that any such implied duty would contradict the explicit terms of the parties' agreement—namely, the provisions requiring Lovilia to obtain Jader's permission before mining on the second parcel, and the provision prohibiting oral modifications to the contract and requiring that notices under the contract be made in writing. *Id.* at 1394. Williams argued that Jader had given Lovilia oral permission to mine under the second tract, but the district court concluded that evidence of a supplemental oral agreement was barred by the parol evidence rule. *Id.* The Seventh Circuit reversed. The court observed that Williams was not offering evidence of additional terms entered into prior to or

contemporaneously with the parties' written agreement, but rather evidence suggesting that the parties agreed to modify their agreement *after* it had expired. *Id.* "Neither the parties' inclusion of a merger clause nor the parol evidence rule bars the introduction of evidence of modifications occurring after the formation of a contract," the court explained. *Id.*

Williams does not establish, as D&B suggests, a general rule that "[a] disclaimer of extra-contractual representations applies only to previous or contemporaneous representations, not subsequent representations." (Pl.'s Resp. Br. 20.) Rather, *Williams* held that neither the parol evidence rule nor the specific merger clause at issue barred the court from considering extrinsic evidence relating to oral representations purporting to modify the contract *after* it was formed. The court did not consider the question of whether a contracting party may disclaim implied-in-fact contractual liabilities that are premised on oral representations made subsequent to the parties' written contract.

This court does not belief such a disclaimer is unenforceable as a matter of law. Plaintiff's claim for breach of an implied-in-fact contract to repair ATX 2012 is barred by section 10.1 of the 2012 SSLA.

**III.    Unjust Enrichment**

Defendant argues that Plaintiff's quasi-contractual claim for unjust enrichment is barred because "no quasi-contractual claims exist when there is an enforceable contract." (Def.'s Mot. for Summ. J. [232], at 9.) A more accurate characterization of the rule is that "when two parties' relationship is governed by contract, they may not bring a claim of unjust enrichment *unless the claim falls outside the contract.*" *Duffy v. TicketReserve, Inc.*, 722 F. Supp. 2d 977, 993 (N.D. Ill. 2010) (emphasis added) (citing *Utility Audit, Inc. v. Horace Mann Service Corp.*, 383 F.3d 683, 688-89 (7th Cir. 2004)). Plaintiff's claim in this case, that Defendant was unjustly enriched by its representations regarding updates to the 2012 ATX software, does not fall outside the parties' contract. As the court explained in the previous section of this opinion, section 10.1 of

the 2012 SSLA bars a claim for breach of an implied-in-fact agreement premised on these representations.

## IV. Illinois Consumer Fraud and Deceptive Business Practices Act

Finally, Plaintiff has asked the court to reconsider Judge Zagel's decision to grant summary judgment for Defendant on Plaintiff's claim under the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA), 815 ILCS 505/1, *et seq.* (*See* Mot. for Reconsideration [209].) Plaintiff's motion is denied, because D&B has not presented any evidence that any of the circumstances relating to its allegations of fraud took place "primarily and substantially in Illinois." *See Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 187, 835 N.E.2d 801, 854 (2005) ("[A] plaintiff may pursue a private cause of action under [ICFA] if the circumstances that related to the disputed transaction occur primarily and substantially in Illinois."); *Morrison v. YTB Intern., Inc.*, 649 F.3d 533, 537 (7th Cir. 2011) (dismissal of ICFA claim on grounds of insufficient connection to Illinois was improper, where complaint alleged that defendant was headquartered in Illinois, relevant "deals" were either "executed" or were "accepted" in Illinois, and relevant payments "were sent to [defendant] in Illinois"); *Shaw v. Hyatt Int'l Corp.*, No. 05 5022, 2005 WL 3088438 (N.D. Ill. Nov. 15, 2005) (allegations that defendant has headquarters in Illinois and that choice-of-law provision designated Illinois law to govern the dispute were insufficient to state ICFA claim), *aff'd* 461 F.3d 899 (7th Cir. 2006).

## CONCLUSION

Plaintiff's Motion to Reconsider [209] is denied. Defendant's Motion for Summary Judgment [231] is granted. Plaintiff's Motion for Class Certification [212] is terminated as moot.

ENTER:

Dated: March 31, 2018

_____
REBECCA R. PALLMEYER
United States District Judge